Receipt number AUSFCC-11516775

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| ASSOCIATED ENERGY GROUP, LLC, d/b/a AEG Fuels,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | No. 26-1542 C<br><br>Judge____________ |

## COMPLAINT

Associated Energy Group, LLC ("AEG"), through undersigned counsel, files this pre-award bid protest challenging the decision-making of the Defense Logistics Agency-Energy ("DLA") regarding its formal written notice dated September 29, 2026, to issue yet another lucrative ***several hundred million dollar*** sole source award to non-responsible contractor, United Capital Investments Group, Inc. ("UCIG") thereby complying with and endorsing the Djiboutian government's ***illegal boycott*** of American contractors from supplying fuel to the U.S. Department of War ("DoW") in Djibouti. In light of the fact that this single source directive has been in effect since 2017, and DLA, consequentially, has issued over $1.3 billion in awards to UCIG, it is time for the DoW and DLA to enforce U.S. competition laws and regulations, its Bilateral Agreement with the government of Djibouti dated February 19, 2003, and to ensure that American contractors are afforded a meaningful opportunity to compete to supply fuel to DLA in Djibouti.

## INTRODUCTION

1. AEG protests DLA's "Memorandum for Notice of Intent to Sole Source" ("Sole Source Notice") dated September 29, 2026, and signed by Contracting Officer Mr. Matthew Womer, wherein DLA identifies UCIG as the "Sole Capable Source" possessing the Djiboutian

government's required Petroleum Activities License ("PAL") and Fuel Supply Commitment Letter ("Supply Commitment Letter") issued by the Djiboutian agency, known as Société Internationale des Hydrocarbures de Djibouti ("SIHD"); the issuance of the PAL and Supply Commitment Letter are both controlled by the Djiboutian Ministry of Energy ("MOE") and are artifices of corruption used by the Djiboutian government to enforce its single source directive implemented in 2017.

2. DLA should not be allowed to continue to obfuscate these facts. DLA fully knows that the Djiboutian government is imposing an illegal boycott of American contractors disguised as compliance with local licensing requirements, which are unavailable to American contractors. The steps of this Courthouse are AEG's only hope for justice.

3. The public record in this long-running protest record make clear that on April 13, 2017, the MOE informed DLA and the State Department that MOE was imposing a single source directive for DLA fuel supply, and that DLA could only use UCIG to acquire fuel in country: "It is brought to the attention of DLA that ***only*** UCIG FZCO Company is authorized to provide fuel refined or derived at Camp Lemonnier in Djibouti." Ex. 1, MOE Note to J. Singh (Apr. 13, 2017) and Embassy Diplomatic Note (May 23, 2017), at 5.

4. DLA, acting through the State Department, initially condemned the MOE's directive, and the State Department issued a Diplomatic Note dated May 23, 2017, informing the Djiboutian government that such violates the Bilateral Agreement between the countries and U.S. competition laws, including the Competition In Contracting Act ("CICA") and "we are unable to comply with the Ministry of Energy's request to ***designate a sole source provider***."[1] Ex. 1 at 3.

5. Notwithstanding those firm positions upfront, DLA ultimately acquiesced to the MOE's single source directive, as evidenced by the undisputed fact that UCIG has been the

---

[1] All emphasis added unless otherwise noted.

supplier of fuel to DLA from 2017 to present—nearly a decade—receiving ***over $1.3 billion dollars*** from DLA.

6. DLA has obfuscated these facts and effectively hidden this illegal boycott of American contractors—the true root cause of this sole source environment. Indeed, DLA has concealed the true "barriers to competition" in Djibouti—barriers it is required by law to identify and "remove or overcome" (FAR 6.104-1(a)(11); 6.303-2(b)(11))—and expressed publicly that it is merely requiring offerors to comply with "Mandatory Host-Nation Licensing" and "strict statutory controls"—referred to as the PAL and Supply Commitment Letter—and that since the MOE only has issued the PAL and Supply Commitment Letter to UCIG, UCIG is the sole supplier who can meet the requirements.

7. Indeed, rather than be transparent and label the PAL and Supply Commitment Letter what they are—artifices of corruption designed to effectuate the single source directive that DLA criticized in 2017—DLA, yet again, conceals and attempts to afford these corrupt devices credibility. *See* Ex. 2, Memorandum for Notice of Intent to Sole Source.

8. In so doing, DLA does not address the fact that the Djiboutian government will not issue a PAL or Supply Commitment Letter to an American contractor, such as AEG, and is using the PAL as a means to enforce its sole source directive.

9. DLA will not admit that it has turned over its decision-making to the Djiboutian government, and that the Djiboutian government will not allow DLA to select an American contractor to supply it fuel in Djibouti. To be clear, DLA will not be honest about the true "barriers to competition" and that it has been unable to "remove or overcome" such barriers now for almost a decade. Because DLA continues to conceal these barriers and placate the Djiboutian

government, the barriers to competition remain and hundreds of millions of U.S. taxpayer dollars continue to get funneled to the MOE's chosen contractor.

10. This protest will expose DLA and demonstrate that the MOE—not DLA—is in charge of the DoW's award decisions concerning fuel supply in Djibouti, and that DLA is concealing the MOE's illegal boycott of American contractors and the true barriers to competition, which not only violates the Bilateral Agreement between the countries and U.S. competition laws, but imperils our nation's security by putting such critically important procurement decisions in the hands of a foreign government who does not have the best interests of the American public in mind.

11. In 2017, DLA and the State Department recognized that "the limitation of only one source to supply the United States' fuel at Camp Lemonnier is a ***security concern*** because it increases the possibility of a ***disruption to our fuel supplies and a detrimental impact on our mission***." Ex. 1 at 3. Notwithstanding recognizing this "security concern," DLA and the State Department have accepted it, and have not removed and/or overcome these barriers.

12. In March 2023, when DLA attempted to disregard the MOE's single source directive and make a $450 million award to AEG determining it was the "best value" to DLA, the MOE interceded and immediately halted AEG—an American contractor—from making deliveries to DLA.

13. When AEG sought to appease the MOE and sought assistance in obtaining the PAL, the Director of Hydrocarbons with the MOE—on two separate occasions—***solicited bribe payments*** to facilitate the licensing—all of which was reported to DLA in real time.

14. The corrupt MOE—which is engaged in extortion in violation of the Foreign Extortion Prevention Act ("FEPA")—will not issue AEG a PAL and the concomitant Supply

Commitment Letter unless *maybe* if AEG succumbs to the extortion attempts and directly pays bribes in violation of the Foreign Corrupt Practices Act ("FCPA"). Acquiescing to such payments similarly would render AEG non-responsible, which is a condition for award under FAR Subpart 9.1.

15. Not only is DLA embracing these illegal terms for its procurement and facilitating an illegal boycott and promoting an illegal sole source environment, but DLA is condoning this unethical and corrupt environment by continuing to make seriatim awards to an allegedly non-responsible contractor, UCIG, in violation of FAR 9.103(a), which makes clear that "[p]urchases shall be made from, and contracts shall be awarded to, responsible prospective contractors only."

16. DLA is plainly aware of the host of allegations AEG has made against UCIG including allegations of bid rigging and collusion, overcharging under prior DLA contracts, false statements to DLA, and buying into DLA contracts at below cost pricing only to seek modifications post-award, among other unethical conduct.

17. AEG is mindful that this protest places the Court in a difficult position of interceding into important procurement decisions involving the Horn of Africa, which plays a vital role in protecting U.S. security interests internationally.

18. However, AEG does not believe the path DLA has chosen is in the best interests of the American public or the American warfighter and believes—as does the State Department—that it imperils our nation's security by placing critically important mission-impact decisions in the hands of a foreign government, who at any time could restrict or block fuel deliveries to DLA.

19. AEG respectfully requests that this Court hold DLA accountable and find that its decision-making in this procurement has departed from governing laws and regulations and that DLA effectively has condoned and sanctioned an illegal boycott of American contractors from

supplying fuel in Djibouti, which violates the Bilateral Agreement between the countries, CICA, the sole source requirements engrained in the FAR and, consequentially, created an improper sole source environment to a non-responsible offeror.

20. The time has come for DLA to be transparent with the American public about the sole source directive and illegal boycott imposed in Djibouti and that it has been unable to "remove or overcome" these "barriers" to competition since 2017. In sum, the Court should enjoin DLA and require it to conduct its procurement in accordance with governing laws and regulations.

21. DLA's apparent efforts to legitimize the artifices of corruption—i.e., the "Mandatory Host-Nation Licensing"—in the name of ensuring a continued supply of fuel delivery in Djibouti reflects nothing short of concealing the true barriers to competition and contravenes the "procurement integrity" and "fundamental fairness" required in all federal agency procurements. This protest continues to expose a crisis in Djibouti and Court intervention is critical.

## PARTIES

22. AEG is a corporation organized and existing under the laws of Texas with its principal place of business located at 701 Waterford Way, Miami, Florida, USA 33126.

23. AEG is a global fuel provider and fuel logistics support company delivering services to a variety of corporate, commercial, fixed base operator, and government clients at over 3,000 locations around the world. AEG's core business is the marketing and financing of fuel supply and logistics solutions for the world's largest airlines, militaries, and corporate operators, serving a distinguished group of countries which includes the U.S. Department of War, France, the United Kingdom, Italy, Canada, Germany, Colombia, and Brazil, among others. AEG is a world-class fuel logistics company providing comprehensive wholesale and retail solutions that

include fuel additive injection capabilities and expert quality control to meet its customers mission demands globally.

24. Defendant is the United States of America, acting by and through DLA Energy, an agency of the federal government.

**JURISDICTION, STANDING, AND TIMELINESS**

25. This Court has jurisdiction over AEG's pre-award protest under the Tucker Act, 28 U.S.C. § 1491(b)(1), as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870 (1996), which allows the U.S. Court of Federal Claims to hear "an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." *See* 28 U.S.C. § 1491(b)(1).

26. This Court previously decided that AEG has standing to pursue its prior pre-award bid protest challenging DLA's unlawful fuel supply decisions in Djibouti under both Article III and the Tucker Act. *See Associated Energy Grp., LLC v. United States*, 172 Fed. Cl. 799, 810–11 (2024) (finding AEG has standing because AEG "has a 'substantial chance' of securing the award without the disputed licensing and price provisions," and correctly holding that AEG's allegations must be taken as true for purposes of a motion to dismiss). The same rationale applies here, as AEG has a substantial chance of securing the award without the illegal boycott and related disputed PAL and Supply Commitment Letter provisions.

27. The Court's prior reasoning concerning pre-award standing applies equally here:

> [I]t would be inappropriate for the Court to presume or otherwise speculate about future performance roadblocks in deciding this threshold issue in the pre-award context. Rather, in assessing AEG's standing to challenge the solicitation, this focus must remain on the contractor's likelihood of winning the award ***in the***

> ***absence of the contested terms***. The legality and reasonableness of the local licensing and pricing requirements-including the likelihood that the Djiboutian government will again enforce the MOE-issued PAL and SIHD-issued supply commitment letter mandates-***go to the merits of AEG's challenges to the solicitation as opposed to AEG's standing to raise them***. To find otherwise would require a ***prophetic analysis of a contractor's eventual success on the merits*** to determine whether they had standing to bring the claim in the first instance. ***The cart must not pull the horse***.

*Id.*

28. AEG stands ready, willing, and capable to perform fuel services in Djibouti as it was the awardee under a predecessor solicitation and determined to be the "best value." Prior to the MOE's interference, AEG delivered fuel to DLA through its in-country team. Through this Sole Source Notice, DLA is preventing prospective fuel suppliers such as AEG from competing. But for DLA's pre-award errors, AEG would be able to submit a competitive proposal and would have had a substantial chance of receiving the award to provide fuel supply services in Djibouti.

29. AEG's pre-award bid protest through this Complaint is timely filed because it learned of DLA's Sole Source Notice on September 29, 2026, and filed a timely written capabilities statement on or before October 15, 2026, at 12:00 PM Eastern Time, the date and time DLA requested written capability statements demonstrating an organization's "ability and qualifications (including proof of required in-country licensing and supply commitment letter from SIHD)." AEG now files this protest. Moreover, prior to filing this instant protest, AEG notified DLA and its counsel with the U.S. Department of Justice, as well as the Clerk of this Court, to coordinate the filing of the bid protest.

30. On October 14, 2026, assigned counsel with the Department of Justice informed AEG that DLA agrees not to make <u>any</u> sole source award to UCIG prior to March 31, 2027, a decision on the merits by the Court, or dismissal of the protest by Court. This voluntary stay of award obviates the need for AEG to file for preliminary injunctive relief.

## STATEMENT OF FACTS

### I. OVERVIEW OF FUEL DELIVERY IN DJIBOUTI

31. In Djibouti, SIHD is an integrated, state-owned oil company, which is intended to cover the country's needs for petroleum products. *See* Ex. 3, Decl. of Retired Col. Todd Cheney ("Cheney Decl.") ¶ 10. This 100% state-owned entity's primary mission is to ensure the importation of hydrocarbons and derivatives under the best price conditions in Djibouti. *Id.* SIHD is under the control of the MOE, and the Director of Hydrocarbons, Wahib Ali Boullo, sits on SIHD's Board of Directors. *Id.* ¶ 9.

32. To that end, all fuel supplied in Djibouti must initially be purchased from SIHD. *Id.* ¶ 11. In accordance with the Djiboutian Customs Code, "[A] price structure for petroleum products is established monthly in accordance with the memorandum of understanding signed between the Ministry of Economy and Finance and oil companies." *Id.* Each month, the Djiboutian Ministry of Budget ("MOB")—not SIHD—sets the fuel prices for diesel and jet fuel, and there are unique postings for various consumer groups in the national market. *Id.* In accordance with the memorandum of understanding, MOB provides monthly updates to the three authorized fuel distributors—UCIG, NOC Djibouti, and Rubis Energie Djibouti—the latter two are AEG's in-country fuel suppliers. *Id.* The MOB price is based on an industry-standard Platts index plus other local costs. *Id.* These posted price sheets provide a comprehensive breakdown of the cost build up related to local costs (e.g., port fees, storage fees). *Id.* The distribution companies identify the volume of fuel they intend to use for the following month, and the pricing is set with their nominations or selections. *Id.*

33. As a result of Djibouti's strategic location, many foreign governments and non-governmental agencies maintain a presence and significant fuel needs in Djibouti. For example, the United States, France, Japan, Italy, and China each maintain military bases in Djibouti. *Id.* ¶

12. In addition, the North Atlantic Treaty Organization ("NATO") and the United Nations ("UN") consume significant amounts of fuel. *Id.* ¶¶ 12, 17, 24, 45. AEG and its in-country team presently supply fuel to several of these foreign government customers, notwithstanding not possessing the PAL. *See id.* ¶¶ 17, 24, 45 ("Since April 2023, AEG has provided fuel through both NOC Djibouti and Rubis Energie Djibouti to numerous commercial and governmental entities, including the Italian, German, Turkish, Dutch, and Japanese militaries, the North Atlantic Treaty Organization and United Nations" and "during 2023 and 2024, AEG has provided 1,688,487 gallons of fuel products to different military customers in Djibouti").

## II. DLA HAS COMPLIED WITH THE MOE'S ILLEGAL SINGLE SOURCE DIRECTIVE SINCE 2017

34. When AEG first learned and notified DLA, and then ultimately this Court, of the illegal conduct occurring in Djibouti at the direction of the MOE, it was unaware of how long DLA knew of the Djiboutian government's efforts to ensure that UCIG received every single contract in Djibouti.

35. As AEG's prior cases have transpired and facts have come to light, AEG has learned that DLA has known about the Djiboutian government's illicit behavior since at least 2017. Indeed, on June 4, 2017, Jastar Singh of DLA discussed the Djiboutian government's efforts—through a letter dated April 13, 2017—***to ensure that UCIG became "the only supplier authorized to provide fuel to Camp Lemonier, Djibouti***." Ex. 4, J. Singh Email to J. Chamberlain forwarding 2017 Emails Regarding MOE Note (Mar. 15, 2023), at 4.

36. In response, the State Department informed Mr. Singh via email that the Djiboutian government's "letter has no force of law in Djibouti and is in no way binding. He exceeded his authority, as was confirmed to us by the Foreign Minister." *Id.* at 3. The State Department went on to add that they had "sent a diplomatic note explaining to the [Djiboutian government] that

[State was] disregarding [the] letter ***because it is against our bilateral agreements etc. DLA and other military offices cleared on that diplomatic note***." *Id.* at 4.

37. In the Diplomatic Note, dated May 23, 2017, the State Department stated as follows:

> The bilateral agreements between the governments of the United States and the Republic of Djibouti, specifically, the 2003 Access Agreement, Article VIII ("Contracting") specifies the following: ". . . Should the USG [U.S. Government] award contracts for the acquisition of articles and services, including construction; such contracts shall be awarded in accordance with U.S. laws and regulations…" The Competition in Contracting Act, a U.S. law, and its implementing regulation, the United States Federal Acquisition Regulation, are requirements placed upon the U.S. Government when contracting for supplies and services, including U.S. contracts for fuel supplies and services in Djibouti. In accordance with this law and its implementing regulations, we are prohibited from limiting our procurement efforts to only one company absent a compelling need.
>
> Also, the limitation of only one source to supply the United States' fuel needs at Camp Lemonnier is a security concern because it increases the possibility of a disruption to our fuel supplies and a detrimental impact on our mission. Therefore, we are unable to comply with the Ministry of Energy's request to designate a sole source provider.

Ex. 1 at 2–3.

38. As acknowledged by the U.S. government, Djibouti's actions violate the bilateral agreements—specifically, the 2003 Agreement between the United States of America and Djibouti. That Agreement provides, in relevant part in Article VIII, that "Should the [U.S. Government] award contracts for the acquisition of articles and services . . . ***such contracts shall be awarded in accordance with U.S. laws and regulations***." Ex. 21, Agreement Between the Government of the United States of America and the Government of the Republic of Djibouti on Access to and Use of Facilities in the Republic of Djibouti. As the State Department and DLA properly recognized and knew in 2017, imposing an improper sole source environment based solely on the parochial interests of the Djiboutian government is improper and in violation of U.S. law.

39. Notwithstanding those firm positions upfront, DLA ultimately acquiesced, as evidenced by the undisputed fact that UCIG has been the supplier of fuel to DLA from 2017 to present—nearly a decade—receiving ***over $1.3 billion dollars*** from DLA.

40. Following the MOE formally notifying DLA of its sole source directive in 2017, on February 1, 2018, DLA awarded UCIG a five-year contract (Contract No. SPE60518D1256) relating to the supply of fuel in Africa, including Djibouti and Niger, from 2018 into 2023.

## III. IN 2023, DLA SELECTED AEG AS BEST VALUE AWARDEE

41. In 2022, DLA issued a competitive solicitation seeking a multi-year contract to supply fuel in Djibouti.

42. On February 1, 2023, DLA awarded AEG Contract No. SPE605-23-D-1253 to supply four CLINs from the Solicitation valued at more than $450 million:

| Solicitation CLIN | Fuel Product | Location |
|---|---|---|
| 0008 | Diesel Fuel (DF2) | Camp Lemonnier |
| 0009 | Jet Fuel (JP8) | Camp Lemonnier |
| 0018 | Diesel Fuel (DF2) | Chabelley Airfield |
| 0019 | Jet Fuel (JP8) | Chabelley Airfield |

In its Debriefing Letter, DLA confirmed that for Line items 0008, 0009, 0018, and 0019, Associated Energy Group ***represented the best value to the government***. DLA's selection of AEG as the awardee confirms that DLA did not require AEG to possess the PAL or SIHD Commitment Letter.

43. Shortly after contract award, AEG, indicative of its capabilities and those of its in-country fuel supply team, fulfilled spot buys from DLA and ***made fuel deliveries to DLA in Djibouti*** using its two in-country fuel suppliers, NOC Djibouti and Rubis Energie Djibouti. On February 9, 2023, DLA ordered 1,585 gallons of diesel fuel at Ali Oune. NOC Djibouti filled the order. Ex. 3, Cheney Decl. ¶ 16. On March 29, 2023, DLA issued another order to AEG. To fulfill that order, Rubis Energie Djibouti supplied DLA 4,000 gallons of diesel fuel. *Id.* Neither

AEG nor its in-country fuel suppliers possessed the PAL, but nonetheless were capable of supplying the fuel and did so, just as they are capable today.

## IV. AEG REPORTS MOE INTERFERENCE AND CORRUPTION IN DJIBOUTI PREVENTING AEG FROM PERFORMING

44. As a responsible contractor who has been steadfastly committed to supporting DLA worldwide for over a decade and in Djibouti, AEG immediately notified DLA of the MOE's interference with AEG's ability to supply fuel in Djibouti and the MOE's solicitation of "under-the-table payments." AEG mistakenly believed that DLA would address these matters promptly and restore order to this procurement.

### A. AEG REPORTS MOE INTERFERENCE, THE MOE'S CONCERNS WITH AN "AMERICAN" COMPANY SUPPLYING FUEL, AND COLLUSION

45. In AEG's email dated February 22, 2023, with subject line "New Developments in Djibouti—Attention Requested" and marked high importance, AEG reported the MOE's interference and threats of "***severe measures***" due to AEG's status as an ***"American" company***. Ex. 5, MOE Impeding Performance Email, at 2. AEG disclosed that the MOE first accused AEG's supplier of "fraudulently and illegally supplying Camp Lemonier with petroleum products," "***for the benefit of a foreign company*** not operating on national territory," and threatened that "severe measures will be taken against the [supplier]" should this continue. *Id.* Mr. Womer confirmed receipt and, as he requested, AEG continued to share developments. *See* Ex. 6, M. Womer Email, "RE: New Developments in Djibouti—Attention Requested" (Feb. 27, 2023).

46. On March 7, 2023, AEG offered DLA options to consider and explained that if the "MOE is acting on behalf of a contractor doing work with DLA and that contractor is benefiting from these hostile actions, as is believed by NOC Djibouti, DLA has the authority under FAR Subpart 9.4 to threaten debarment proceedings …," and that such an "inquiry alone could cause MOE to halt any further action." *Id.* at 1.

47. On March 8, 2023, AEG emailed Mr. Matthew Womer (DLA Contracting Officer), Mr. Steven Sosko (DLA Legal Counsel), Mr. Jastar Singh (DLA Direct Delivery Fuels Division Chief), and Mr. Gerardo Julier Gomez (DLA Acquisition Specialist) to share additional information regarding the MOE and the Director of Hydrocarbons threatening AEG and its suppliers and working to prevent their successful performance of their contract awards. *See* Ex. 7, T. Cheney Email, re: "Update From Djibouti" (Mar. 8, 2023).

48. On March 16, 2023, AEG's counsel emailed Mr. Matthew Womer, Mr. Steven Sosko, Mr. Seth Cohen, and the DLA Suspension and Debarment Office mailbox at DLAsdostaff@dla.mil. In its email, AEG sounded the alarm that "[n]otwithstanding, AEG's substantial investment in mobilization and establishing a strong relationship in country with NOC Djibouti (as well as another licensed fuel supplier, Rubis), the Djiboutian [MOE] has intervened into this contract and thwarted DLA's award decision by physically blocking NOC Djibouti from picking up fuel and delivering it to DoD." *Id.* at 5–6. The disclosure revealed how MOE was now requiring a licensing requirement (the PAL) to supply DLA duel in an effort to direct business to its favored contractor. *Id.*

49. The same day as AEG's disclosure, DLA emailed AEG "request[ing] that you provide a copy of ***all three current licenses*** to operate in Djibouti." Ex. 8, M. Womer Email, "RE: Licenses" (Mar. 16, 2023).[2]

---

[2] In addition, on March 21, 2023, AEG notified Ms. Gabriella M. Earhardt (DLA Director, Supplier Operations) "to ensure [she is] apprised of a concerning development in Djibouti under Contract No. SPE60523D1253 where the Djiboutian Ministry of Energy (MOE), who favors the in-country incumbent fuel supplier, is preventing DoD from receiving fuel from AEG, the recent awardee, and its fuel supplier, NOC Djibouti, and threatening the truck drivers attempting to pick up fuel." Ex. 9, T. Cheney Email, re: "Djibouti" (Mar. 21, 2023).

50. On March 27, 2023, AEG responded and emailed Mr. Matthew Womer, Mr. Gerardo Julier Gomez, and Mr. Jastar Singh confirming that

> [a]ttached is (1) NOC Djibouti's Import License from the Ministry of Budget, (2) NOC Djibouti's Wholesale Hydrocarbons (Merchant) License from the [Ministry of Budget ("MOB")], and (3) NOC Djibouti's proof of payment and corresponding documentation regarding the Petroleum Activities license being unreasonably withheld by the Ministry of Energy. It is our understanding that NOC Djibouti has complied fully with the process for securing this MOE issued license, but that the MOE simply will not issue it to NOC Djibouti given its intent to supply fuel to DLA Energy through AEG. Additionally, we have a (4) Commitment Letter from Rubis, who also has both licenses from the MOB.

*See* Ex. 10, T. Cheney Email "RE: NOC Djibouti Licensing" (Mar. 27, 2023).

51. AEG reminded DLA of MOE's continued improper actions to prevent AEG from performing:

> the MOE is engaged in an all-out campaign to prevent AEG's performance of the DLA Energy contract apparently to ensure that the incumbent UCIG, MOE's apparently favored contractor, remains in control of the supply of fuel in country as opposed to NOC Djibouti through AEG. AEG has expended enormous resources, labor and financial, to shine a spotlight on these egregious activities, including full engagement with the U.S. Ambassador in Djibouti. AEG stands immediately able to perform in country, but for the MOE's concerted efforts to obstruct DLA's award decision. The MOE remains steadfast in its desire to ensure that UCIG remains in control of the supply of fuel to DLA Energy. ***DLA should not be strongarmed into using a source of supply insisted upon by a foreign government.***

*Id.*

52. On March 27, 2023, AEG counsel reported allegations concerning UCIG to DLA attorneys Mr. Steven Sosko and Ms. Celia DePaolis. These concerns eventually were memorialized into AEG's Part I and Part II bid protests at the Court (*see infra* Sections V and VI) and later triggered a DOJ investigation and a ruling by the Court, in dicta, that the Court had serious concerns with DLA's determination that UCIG is responsible.

53. On April 1, 2023, AEG sent out another plea for help. Mr. Cheney emailed Mr. Brian Iber, Commander James Burns, Joseph Chamberlain, Mr. Matthew Womer, Mr. Gerardo Julier Gomez, Mr. Robert Simms, and Ms. Gabriella Earhardt. In that email, AEG reported that "[t]his morning the Director of Hydrocarbons, Wahib Ali Boulo, directed the Horizon Terminal GM, Houssein Ahmed Houssein, to block Rubis from delivering diesel to Camp Lemonnier." Ex. 11, T. Cheney Email, "MOE blocking fuel deliveries" (Apr. 1, 2023). He also reminded DLA that "[b]oth NOC Djibouti and Rubis are reputable and respected fuel suppliers in Djibouti and other countries" and that "[t]o date, we have not received a justifiable reason for the obstructions of the Djiboutian Government." *Id.*

### B. AEG Reports Solicitation of "Under the Table Payments" by MOE

54. After reporting those incidents, AEG experienced additional attempts by the MOE to corrupt DLA's procurement process. AEG met with the Director of Hydrocarbons responsible for oversight of fuel distributors and licensing to discuss the PAL matter, learn the official's perspective, to pursue obtaining the PAL and inquire if the MOE would issue such to one or both of its in-country fuel suppliers.

55. On the evening of May 15, 2023, an in-country interpreter informed AEG's representative, Retired Col. Todd Cheney, that he had received a call directly from the Director of Hydrocarbons who informed the interpreter that the Djiboutian MOE Director of Hydrocarbons expected "under-the-table payments" to help AEG do business in Djibouti. Ex. 3, Cheney Decl. ¶ 28. When Mr. Cheney questioned the statement relayed by the interpreter, the interpreter relayed "***you've entered the world of African Government business***." *Id.* The interpreter continued that the solicited payment from AEG would be ***shared among the Director of Hydrocarbons and the Minister of Energy***. *Id.*

56. During a meeting on May 16, 2023, the Director of Hydrocarbons told AEG's representative, Retired Col. Todd Cheney, that if AEG were to abandon working with NOC Djibouti for UCIG, the MOE would no longer stand in its way of supplying fuel to DLA. *Id.* ¶ 30. It is AEG's understanding that the MOE and UCIG have a relationship, and AEG has received reports of UCIG providing an inappropriate gift of a luxury item to MOE officials, including a Toyota truck. *See id.* ¶ 23. Later that week, on May 20, 2022, the MOE Director of Hydrocarbons met with AEG and again solicited under-the-table payments in exchange for receiving a PAL. During the "unofficial" follow-up in-person meeting, the Director of Hydrocarbons, through an interpreter, explicitly solicited such payments from AEG. After the Director spoke, the MOE interpreter informed Mr. Cheney in no uncertain terms "about under-the-table payments" to obtain his assistance in obtaining the PAL. *Id.* ¶ 33. AEG expressly declined the invitation and similarly explained that such conduct would also violate U.S. law.

57. AEG immediately disclosed these events to DLA to ensure DLA was fully aware of the corruption in Djibouti and the MOE's campaign to thwart DLA's award decisions. AEG called the contracting officer, Mr. Matthew Womer, on May 15, 2023 to disclose the solicitation of under-the-table payments by the MOE Director in exchange for the PAL. *Id.* ¶ 29. On May 19, 2023, AEG contacted DLA Director of Direct Delivery Fuels, Jamaal Rose, to disclose to him "what happened with the MOE Director's solicitation of under the table payments." *Id.* ¶ 32. AEG "informed Mr. Rose that AEG would meet with the MOE Director to try to advance progress on the PAL, but under no circumstances would AEG submit and make such illegal and unethical payments." *Id.* After those communications, Mr. Cheney believed that DLA took the matter seriously and would take prompt action to remedy it. Indeed, on May 22, 2023, AEG requested an in-person meeting with DLA regarding the obstructionism and solicitation of under-the-table

payments, which DLA agreed to and confirmed the meeting. *Id.* ¶ 34. Later, however, on May 25, 2023, Mr. Womer cancelled the meeting, citing ongoing litigation and pending corrective action. *Id.*; *see also* Ex. 12, M. Womer Email, "RE: Meeting Request" (May 25, 2023). The cancellation of that meeting effectively foreshadowed that AEG would be on the outside looking in indefinitely.

58. On June 8, 2023, AEG counsel reported the MOE's efforts to extort AEG and solicit bribe payments to the DOJ.

59. After rejecting MOE's attempts to solicit "under-the-table" payments, AEG did not cease its effort to appease the MOE through legal means if possible and even applied for its own PAL and engaged local Djiboutian counsel to assist with the process. Ex. 3, Cheney Decl. ¶¶ 35–41. After many follow-up inquiries with no responses, many months later, the MOE ultimately responded to AEG's inquiries stating that "after analysis, we regret to inform you that we cannot approve your request to be granted a license to distribute petroleum products." MOE's letter continued by noting "that Djibouti is a country with relatively low fuel consumption, ***and we already have three companies operating in the sector distributing these products***." Ex. 13, Letter from MOE Director of Hydrocarbons (original and translated) (Oct. 16, 2023). These three companies are NOC Djibouti, Rubis Energie Djibouti, and UCIG. Put differently, on the one hand, the MOE denies AEG a license on grounds that it already has three authorized fuel suppliers and does not need another; while, on the other hand, the MOE refuses to allow AEG's authorized suppliers from delivering fuel to DLA. The MOE's position—as the full record ultimately will show—changes based on its audience. AEG has exposed all of these facts and yet DLA has not changed course. Rather, DLA appears to be committed to working with UCIG and playing by the MOE's corrupt procurement system.

## V. Part I – AEG Protests Solaris Award and Alleges Collusion and Bid Rigging by Solaris, UCIG and Zelawar

60. On April 5, 2023, AEG protested DLA's award of CLIN 0007 to Solaris under Solicitation No. SPE605-22-R-0209 at the Court primarily challenging DLA's flawed responsibility determination in light of what AEG viewed as overwhelming evidence of bid rigging, collusion, and a number of false statements to DLA as to Solaris's capabilities, past performance, and relationship to UCIG. *See* Compl., *Associated Energy Group, LLC v. United States*, No. 23-477 (Fed. Cl. Apr. 5, 2023) ("*Part I*"), ECF No. 1.

61. Rather than take corrective action, DLA vigorously defended its award to Solaris despite mounting evidence indicating that DLA did not consider the plethora of adverse information reflecting negatively on Solaris' responsibility. Indeed, the information showed bid rigging and collusion, which AEG raised with the Department of Justice. *See* Ex. 14, Redacted *Part II* Tr. at 162:7–12 ("To our knowledge, AEG raised those bid rigging allegations with the Department of Justice at the same time as it filed its motion for judgment…"). DLA has been on notice of AEG's views and documented evidence that UCIG, Solaris, and Zelawar engaged in bid rigging and collusion with regard to the immediately preceding procurement.

62. With the stay about to expire, DLA asked the Court to extend the stay over AEG's opposition. On October 31, 2024, the Court denied DLA's request to extend the stay and, instead, scheduled oral arguments on the respective MJARs on December 8, 2023, and indicated a decision on the protest would be issued soon after. Order, *Associated Energy Group, LLC v. United States*, No. 23-477 (Fed. Cl. Oct. 31, 2023), ECF No. 61.

63. Less than a month after having its request to stay the case denied, DLA filed a notice announcing its intent to take corrective action over a six-month period that involves canceling any awards under the Solicitation, re-issuing the solicitation, and performing new

evaluations. DLA, in essence, accomplished the stay through corrective actions and circumvented a decision on the merits, which unquestionably—pre-imposition of the PAL—would have been a ruling in AEG's favor on the merits consistent with the Court's subsequent Part II *dicta* ruling. DLA stated that it "intends to take corrective action in this case by terminating the award to Solaris Energy DMCC (Solaris) and issuing a new solicitation as a lowest-price technically acceptable (LPTA) procurement. Under the new solicitation, DLA will request new offers and perform a new technical evaluation and responsibility determination and any other evaluation the agency deems appropriate." Ex. 15, *Part I*, Def.'s Notice of Corrective Action (Nov. 30, 2023), ECF No. 73.

## VI. PART II – AEG PROTESTS UCIG SOLE SOURCE AWARD

### A. AEG REPORTS SUSPECTED OVERCHARGING TO DLA

64. On July 30, 2023, AEG disclosed to DLA additional allegations of unethical conduct by UCIG, including overcharging of approximately $200 million on the incumbent contract from 2018 through 2022. In other words, on the immediately preceding incumbent contract held by UCIG, AEG alleged that UCIG has overcharged DLA by inflating its cost-basis.

### B. DLA AWARDS SOLE SOURCE CONTRACT TO UCIG

65. After agreeing to *stay performance* of the fuel contract *to Solaris* while the Court resolved AEG's Part I bid protest, DLA continued to make non-competitive purchases on a sole source basis for fuel in Djibouti from Solaris-affiliate UCIG. *See* Ex. 14, Redacted *Part II* Tr. at 184:13–15 ("With regard to the interim fuel purchases between April and August of 2023, DLA purchased fuel from UCIG through a series of one-time spot buys."). Although most of the details of each of these sole source awards, including date of award and amount, remains unknown, AEG was not invited or solicited to submit offers for these spot buys.

66. On September 1, 2023, DLA awarded UCIG a sole source contract, Contract No. SPE605-23-D-1257, *for $134,064,991* involving the supply of fuel in Djibouti from September 1, 2023, through February 29, 2024, with an option to extend performance another six months until August 31, 2024. *See* Ex. 16, Redacted Sole Source J&A No. 23-0027 (Sept. 28, 2023) at 1 ("The contract period of performance is September l, 2023, through February 29, 2024, with a 6-month option to extend performance to August 31, 2024.").

67. Importantly, and despite DLA being fully aware of the MOE's single source directive since 2017 and its efforts to halt AEG's performance in 2023, the J&A states that "DLA Energy only solicited UCIG for the Bridge Contract because UCIG is ***uniquely qualified*** to perform the requirements." *Id.* at 4. In AEG's words, DLA awarded UCIG a sole source because it is only contractor to whom the ***MOE has issued a PAL*** but DLA, again, chose to obfuscate the facts creating the impression that this was due to a credible licensing matter.

### C. AEG Challenges DLA's Second Flawed Responsibility Determination at the Court—Part II

68. On December 20, 2023, AEG protested DLA's sole source award to UCIG at the Court. *Associated Energy Group LLC v. United States*, No. 23-2158 (Fed. Cl. Dec. 20, 2023). Specifically, AEG explained that DLA improperly ignored the extensive evidence unearthed in the Part I protest showing bid rigging and the additional reports of overcharging against UCIG. AEG also alleged that DLA failed to comply with the regulatory requirements for using sole source awards.

69. On February 29, 2024, after full briefing on the merits and at the final merits hearing, this Court ultimately agreed that the responsibility determination was flawed, but found that the Court lacked jurisdiction and could not grant AEG the relief it was seeking. *See* Ex. 14, Redacted *Part II* Tr. at 187:2–188:4 ("this Court has no authority to direct the DLA to issue a

contract award that purposely omits compliance with the sovereign nation's law or laws, including licensing requirements, where performance is to take place on that sovereign soil. This Court has no authority to direct the Government of Djibouti to issue the required PAL to AEG or one of its onsite fuel delivery contractors or direct contract performance without the necessary fuel transportation license."). Notwithstanding the Court finding it lacked jurisdiction, it otherwise concurred with the merits of AEG's protest challenging UCIG's responsibility and in turn, DLA's responsibility determination:

> I would be remiss if I did not remark in dicta ***my concerns regarding the contracting officer's decision to summarily disregard AEG's documented allegations of bid rigging, fraud, and corruption against the very contractor being awarded the sole source contract*** in the course of the contractor's performance of the predecessor contract upon which it secured its status as the incumbent contractor.
>
> I am not saying that the contracting officer should not have taken into account the source of the allegations, that being the disappointed competitor, or that discounting the allegations was not reasonable, but ***the manner in which they were seemingly disregarded raises serious questions regarding this Court's ability to discern whether they were disregarded or discounted and leaves many questions unanswered.***

*Id.* at 190:2–22.

70. At that hearing, the Court pointedly asked the government what is "***to prevent the Djiboutian Government from dictating who the [United States] Government can and cannot contract with***," relaying its "concern" if DLA decided to issue another sole source award "to go with UCIG again for another year." *Id.* at 71:24–72:6. In response, government counsel stated as follows, invoking the rationale for why the United States does not provide fuel in Iran:

> Well, ***that would present a different question <u>because at that point it would be the Djiboutian Government specifically limiting the United States Government</u>.*** And this is why the United States Government doesn't provide fuel in Iran, for example, because that country—for multiple reasons, but because that country sets very specific requirements on who can enter, and these requirements are things that the United States ***Government doesn't agree with and will not condone***.

> And so ***if that situation does come about, then yes, DLA will have to make the determination of whether it will or will not condone those actions***.

*Id.* at 72:7–19. In light of the information before DLA at the time of that hearing, it already knew that the Djiboutian government was imposing a single source directive and yet remained undisclosed to AEG or the Court and was withheld from the record.

### D. DLA Exercises the Option to Extend Sole Source Period of Performance

71. On February 29, 2024, DLA exercised the option to extend the sole source award through August 21, 2024. *See* Ex. 17, Sole Source Modification. During this sole source, DLA paid $5.76327 for diesel fuel (DF2), $4.94830 for jet fuel (JP8), and $6.61800 for gasoline (MUR). *Id.* at 2.

| | AEG Award Price (per gal.) | UCIG Sole-Source Price (per gal.) | **Overpayment Differential (per gal.)** |
|---|---|---|---|
| DF2 | $3.550975 | $5.76327 | **$2.212295** |
| JP8 | $4.153197 | $4.94830 | **$0.795103** |

## VII. DLA Issues New Solicitation to Supply Fuel in Djibouti Including PAL Requirement

72. On April 2, 2024, the same day as the status conference before the Court on AEG's Part III protest, DLA issued Solicitation No. SPE605-24-R-0205 to provide fuel across Africa, including Djibouti. The Solicitation, as amended, required offerors to submit offers by May 6, 2024. The Solicitation included 16 CLINs for the delivery of different fuel products to different African countries specifying the applicable price index for the equitable price adjustment clause and the base reference price from that index for January 29, 2024, including eight CLINs to supply Djibouti:

| CLIN | Product | Applicable Price Index | Base Ref. Price |
|---|---|---|---|
| 0003 | MUR | Platts 95 RON Unleaded FOB Arab Gulf AAICY00 Previous Monthly Average | $2.081000 |

| CLIN | Product | Applicable Price Index | Base Ref. Price |
|---|---|---|---|
| 0004 | DF2 | Supplier Notice Price Provided by SIHD. | $5.112275 |
| 0005 | JP8 | Supplier Notice Price Provided by SIHD. | $5.197448 |
| 0006 | SFD | Supplier Notice Price Provided by SIHD. | $5.112275 |
| 0009 | DF2 | Supplier Notice Price Provided by SIHD. | $5.112275 |
| 0010 | JP8 | Supplier Notice Price Provided by SIHD. | $5.197448 |
| 0012 | DF2 | Supplier Notice Price Provided by SIHD. | $5.112275 |
| 0013 | SFD | Supplier Notice Price Provided by SIHD. | $5.112275 |

*See* Ex. 18, Combined Synopsis/Solicitation No. SPE605-24-R-0205, at 8–9.

73. For offerors proposing to supply fuel in Djibouti, the Solicitation required offerors to provide copies of its "(1) Patente D'ACTIVITE Hydrocarbures en gros (marchand d') (Hydrocarbon Wholesale License (Merchant))—Issued by the Djiboutian Ministry of Budget and (2) Licence d'Activité Pétrolière (Petroleum Activities License)—Issued by the Djiboutian Ministry of Energy." *Id.* at 33. It also required offerors to "provide a supply commitment letter from S.I.H.D, la Société Internationale des Hydrocarbures de Djibouti, covering the period of performance, quantities, and fuel types listed in the Schedule." *Id.*

## VIII. AEG CONTINUES TO DELIVER FUEL IN DJIBOUTI

74. AEG, acting through its in-country suppliers, has continued to supply fuel in Djibouti to other customers, except DLA. Since April 2023, AEG has provided fuel through both NOC Djibouti and Rubis Energie Djibouti to numerous commercial and governmental entities, including the Italian, German, Turkish, Dutch, and Japanese militaries, NATO, and the UN. Ex. 3, Cheney Decl. ¶¶ 17, 24, 45. Indeed, during 2023 and 2024, AEG has provided 1,688,487 gallons of fuel products to different military customers in Djibouti. *Id.*

75. Like all fuel in Djibouti, AEG, through its suppliers, received the fuel supplied to these military entities from SIHD at prices that the MOB distributed on a monthly basis to AEG's in-country fuel suppliers, NOC Djibouti and Rubis Energie Djibouti. *Id.* ¶ 24. MOB sends letters to all fuel suppliers each month listing the price for various fuel products that SIHD provides. *Id.*

76. Upon learning initially of the Solicitation requirement to obtain a Supply Commitment Letter from SIHD, AEG's in-country suppliers, NOC Djibouti and Rubis Energie Djibouti, sought to obtain such from SIHD. but without the PAL at that time, they were denied the Commitment Letter. *Id.* ¶ 19. Importantly, SIHD is a Djiboutian-owned entity and under the control of the MOE. *Id.* ¶¶ 9–10.

## IX. DLA AWARDED ALL DJIBOUTI CLINS TO UCIG, THE ONLY OFFEROR WITH A PAL–AT HIGHER PRICES–$56MM OVER AEG'S PROPOSED PRICES

77. On September 26, 2024, DLA awarded Contract No. SPE605-24-D-1254 to UCIG, including all eight Djibouti CLINs from the Solicitation.

78. On September 27, 2024, AEG received an unsuccessful offeror letter, indicating that UCIG had been awarded CLINs 0003–06, 0008–09, 0011–12. AEG submitted debrief questions to DLA, and on October 7, AEG received a debrief letter and redacted SSDD from DLA. AEG asked DLA "What factors made AEG unsuccessful for 9 CLINS that it was not selected for award?" With respect to the Djibouti CLINs, DLA responded:

> AEG's proposal was evaluated in accordance with the Solicitation criteria under subfactor D, and its proposal was determined to be Unacceptable for line items 0003, 0004, 0005, 0006, 0008, 0009, 0011, and 0012 because ***AEG Fuels failed to provide the Petroleum Activities License and a supply commitment letter from SIHD*** in accordance with subfactor D on page 33 of the solicitation. See Attachment 1 Redacted SSDD.

Ex. 19, Post-Award Debrief (Oct. 7, 2024).

### A. THE PAL IS A LICENSE TO STEAL, WITH UCIG CHARGING DLA OVER $56 MILLION ABOVE AEG'S PRICE

79. DLA disregarded AEG and every other offeror for the eight Djibouti CLINs—CLINs 0003–06, 0008–09, and 0011–12—for failing to have a PAL, which DLA knew when preparing the Solicitation that no other offeror can possess. This was a competition in name only.

80. UCIG and other offerors submitted bids for some or all of the Djibouti CLINs. None of UCIG's competitors had a PAL as DLA knew before it issued the Solicitation.

81. Due to DLA's unlawful imposition of the PAL requirement, DLA refused to consider offerors without a PAL or SIHD letter.

82. In sum, because of the PAL and SIHD requirements, AEG estimates that DLA is paying $55 million more for this procurement:

| CLIN | Difference between AEG and UCIG (in USD) | AEG Total Amount Offered (in USD) | UCIG Total Amount Awarded (in USD) | Difference between total values (in USD) |
|---|---|---|---|---|
| 0003 | 3.091558 | 846,682.20 | 1,650,487.28 | 803,805.08 |
| 0004 | 0.516848 | 114,913,890.00 | 124,992,426.00 | 10,078,536.00 |
| 0005 | 0.528143 | 293,006,025.00 | 318,752,996.25 | 25,746,971.25 |
| 0006 | 0.516848 | 38,304,630.00 | 41,664,142.00 | 3,359,512.00 |
| 0009 | 0.516848 | 8,618,541.75 | 9,374,431.95 | 755,890.20 |
| 0010 | 0.528143 | 23,440,482.00 | 25,500,239.70 | 2,059,757.70 |
| 0012 | 0.516848 | 114,913,890.00 | 124,992,426.00 | 10,078,536.00 |
| 0013 | 0.516848 | 38,304,630.00 | 41,664,142.00 | 3,359,512.00 |
| **Total:** | | **632,348,770.95** | **688,591,291.18** | **56,242,520.23** |

## X. DLA ISSUES A MEMORANDUM FOR NOTICE OF INTENT TO SOLE SOURCE FROM UCIG, IMPLAUSIBLY DESCRIBED BY THE GOVERNMENT AS THE ONLY RESPONSIBLE CONTRACTOR IN DJIBOUTI

83. On September 29, 2026, DLA issued a Memorandum for Notice of Intent to Sole Source pursuant to 10 U.S.C. § 3204(a)(1), as implemented by FAR 6.103-1. Ex. 2 at 1.

84. The Sole Source Notice provides as follows:

1. **Mandatory Host-Nation Licensing:** The Government of Djibouti exercises strict statutory controls over the importation, commercial handling, transport, and offloading of bulk hydrocarbons. Vendors operating within the country must possess the following licenses;

 • Patente D'ACTIVITE Hydrocarbures en gros (marchand d') (Hydrocarbon Wholesale License (Merchant)) – Issued by the Djiboutian Ministry of Budget.

 • Licence d'Activité Pétrolière (Petroleum Activities License) – Issued by the Djiboutian Ministry of Energy.

 • Supply commitment letter from Société Internationale des Hydrocarbures de Djibouti (SIHD).

2. **Sole Capable Source:** Currently, **United Capital Investments Group, Inc. (UCIG)** is the only identified commercial contractor that possesses the active, verified Petroleum Activities License, required local regulatory permissions, established in-country distribution network, and credentialed transport infrastructure capable of meeting the stringent delivery schedules and strict military fuel specifications at both Camp Lemonnier and Chabelley Airfield without severe mission degradation or disruption to U.S. military readiness.

85. According to the Sole Source Notice, DLA has determined that UCIG "is the only identified commercial contractor that possesses the active, verified Petroleum Activities License, required local regulatory permissions, established in-country distribution network, and credentialed transport infrastructure," thus making UCIG, according to DLA, the "Sole Capable Source" and the only "responsible source." *Id.*

86. Equally troubling is DLA's justification provided for this new sole source award to UCIG. In an effort to add credibility to the PAL and Supply Commitment Letter terms, DLA describes the reasoning as "Mandatory Host-Nation Licensing" consisting of "stringent legal, regulatory, and logistical hurdles." *See id.* DLA states that the Djiboutian government "***exercises strict statutory controls*** over the importation commercial handling, transport, and offloading of bulk hydrocarbons," and then expressly invokes the PAL and Supply Commitment Letter terms. *Id.* at 2.

87. DLA, in other words, again went out of its way to elevate and add credibility to these terms, despite knowing that they are being used by the MOE to effect an illegal boycott of

American contractors and to continue the single source directive in place since 2017. DLA also again made a flawed responsibility determination of UCIG despite the extensive adverse information before it reflecting negatively on UCIG's responsibility.

## COUNT I

### (PRE-AWARD PROTEST: BY ADOPTING THE PAL AND SUPPLY COMMITMENT LETTER TERMS, DLA HAS COMPLIED WITH MOE'S ILLEGAL BOYCOTT OF AMERICAN CONTRACTORS IN VIOLATION OF THE FAR, CICA, AND THE BILATERAL AGREEMENT BETWEEN THE UNITED STATES AND DJIBOUTI)

88. AEG incorporates by reference the foregoing paragraphs as if fully stated herein.

89. DLA's decision-making in this procurement has departed from governing laws and regulations including the Bilateral Agreement. Indeed, DLA effectively has condoned and sanctioned an illegal boycott of American contractors from supplying fuel in Djibouti, which violates the Bilateral Agreement between the countries, CICA, the sole source requirements engrained in the FAR and, consequentially, created an improper sole source environment to a non-responsible offeror.

90. By embracing the PAL and Supply Commitment Letter terms dictated by the MOE, DLA has effectively agreed to boycott American contractors, including AEG, from being able to compete to supply fuel for DLA in Djibouti. Because DLA apparently does not want to acknowledge the illegal and non-competitive environment it finds itself in, where a foreign government is dictating the awardee of a lucrative DoW contract, DLA instead attempts to inculcate credibility to the MOE's imposed terms.

91. Notwithstanding DLA's efforts, the facts unequivocally illustrate that the MOE will not issue a PAL or Supply Commitment Letter to an American contractor. Indeed, the facts show that the MOE will only allow UCIG to supply DLA with fuel. In turn, the MOE's dictated terms, which have been adopted by DLA, result in an illegal boycott of American contractors, violate the

Bilateral Agreement between the countries, and violate the competition and contractor responsibility requirements engrained in U.S. law.

92. During an earlier hearing before this Court, the Court raised the question over what DLA's position would be if the PAL and Supply Commitment Letter terms were merely being used to direct who DLA did business with.

93. At the February 29, 2024 hearing, the Court asked the government what is "***to prevent the Djiboutian Government from dictating who the [United States] Government can and cannot contract with***," relaying its "concern" if the United States decided "to go with UCIG again for another year." Ex. 14, Redacted *Part II* Tr. at 71:24–72:6. In response, government counsel stated as follows, invoking the rationale for why the United States does not provide fuel in Iran:

> Well, ***that would present a different question <u>because at that point it would be the Djiboutian Government specifically limiting the United States Government</u>.*** And this is why the United States Government doesn't provide fuel in Iran, for example, because that country—for multiple reasons, but because that country sets very specific requirements on who can enter, and these requirements are things that the United States Government doesn't agree with and will not condone.
>
> And so ***if that situation does come about, then yes, DLA will have to make the determination of whether it will or will not condone those actions***.

*Id.* at 72:7–19.

94. The Court's question to the government prophesized the exact circumstances found before the Court today: MOE ***is*** dictating that the government can only contract with UCIG.

95. As the government appeared to plainly recognize during the prior hearing, it would be improper for the U.S. government to comply, and in turn endorse, a foreign government's boycott of American companies.

96. The boycott violates Article II of the 2003 Agreement Between the United States and Djibouti, which states in relevant part as follows:

> U.S. personnel and ***U.S. contractors and vehicles, vessels, and aircraft operated by or for U.S. forces may use and have unimpeded access*** to [Camp Lemonnier and such other facilities and areas in the Republic of Djibouti as may be mutually agreed] and areas for training, transit, support and related activities, ***refueling of aircraft***, maintenance of vehicles, vessels and aircraft, accommodation of personnel, communications, staging of forces.

Ex. 21, at Art. II ("Use of Facilities").

97. Article VIII to the Bilateral Agreement further makes clear that "[s]hould the USG award contracts for the acquisition of articles and services, including construction; ***such contracts shall be awarded in accordance with U.S. laws and regulations***."

98. Here, DLA has violated the Bilateral Agreement by improperly acquiescing to the Djiboutian government's illegal actions, which have impeded American contractor access to Camp Lemonnier while simultaneously violating a litany of U.S. laws and regulations requiring that public procurements be competed. Indeed, the government has known this since at least June 4, 2017, when a State Department representative wrote Jastar Singh back then that Djibouti's desire to create a sole source environment for UCIG "***is against our bilateral agreements***." Ex. 4 at 3–4.

99. During the prior merits hearing before the Court challenging the 2023 sole source to UCIG, the undersigned proffered that DLA cannot impose a solicitation or contract requirement upon a contractor that to satisfy requires a contractor to engage in illegal conduct. *See, e.g.,* Ex. 14, Redacted *Part II* Tr. at 59:8–11 ("Can the U.S. Government impose a solicitation requirement that they know to require a U.S. company to violate law, and the answer is no."). During that hearing, DLA concurred. *Id.* at 63:9–10 ("DLA cannot knowingly include an illegal solicitation requirement"). DLA, however, at that time, contended that it *did not have knowledge* of illegal terms. In DLA's views, such allegations have not yet been "proven." *See, e.g.*, *id.* at 69:12–19 ("[B]ut this is not the correct venue for deciding [AEG's] allegations. Those allegations are

entitled to due process, which we do not have here. So once and ***if*** those allegations are found to be well founded, then, ***yes, AEG can claim that DLA has included an illegal contract requirements. But until then—there's no basis for that.***"). While that discussion was acutely focused on the solicitation of bribes, we now know that DLA has embraced illegal terms that result in an illegal boycott of American contractors, violations of U.S. competition laws, and violations of the Bilateral Agreement.

100. In addition, DLA's conduct as described herein violates a fundamental canon of public procurement mandating that all procurements must be conducted "with integrity, fairness, and openness." FAR 1.102(b)(3) (procurements shall be conducted "with ***integrity***, fairness, and openness"); *see also* FAR 1.102-2(c)(1) ("Not only must the [Federal Procurement] System have integrity, ***but the actions of each member of the Team*** must reflect integrity, fairness, and openness.").

101. Moreover, DLA's action as described herein improperly favors an alleged non-responsible contractor that has obtained the MOE's most favored contractor status, which further violates the FAR. *See* FAR 1.102-2(c)(3) (requiring all contractors to be "treated fairly and impartially"); FAR 1.602-2(b) (stating that all contractors shall receive "impartial, fair and equitable treatment"); FAR 3.101-1 ("government business ***shall be conducted in a manner above reproach*** … with complete impartiality and with preferential treatment for none").

102. But as currently crafted, the Sole Source Notice and intended award is not being conducted in a manner "above reproach" or "with complete impartiality and with preferential treatment for none." By including the PAL and Supply Commitment Letter requirements, DLA has done exactly what the MOE desired, thereby tainting the procurement process with the MOE's corruption and ensuring a sole source award to UCIG, a non-responsible contractor.

103. The MOE, acting at the direction of the Director of Hydrocarbons, previously expressed that AEG can only obtain a PAL by paying an illegal under-the-table payment. But paying such a bribe would violate U.S. criminal law, including the FCPA and FEPA, and render AEG non-responsible. As a result, AEG has an impossible choice—break the law or be eligible to compete for this Solicitation. Imposing such a choice is inconsistent with DLA's obligations under the FAR and its core values as a responsible contractor consistent with FAR 52.203-13, Contractor Code of Business Ethics & Conduct—a clause incorporated into AEG's DLA contracts. *See* FAR 1.102(b)(3).

104. DLA's conduct prejudices AEG by preventing it from competing to provide fuel supply services in Djibouti.

105. Because the procurement's requirements conflict with federal law and the 2003 Agreement between the United States and Djibouti, among other laws and regulations, this Court should strike those provisions. *See, e.g., U.S. Foodservice, Inc. v. United States*, 100 Fed. Cl. 659, 686 (2011) ("[T]he Government may never insist upon offerors conforming to irrational terms").

106. For these reasons, DLA's decision to include the PAL and associated Supply Commitment Letter requirements—which conflict with other lawful provisions—was arbitrary and capricious, and this Court should sustain this protest.

## COUNT II

### (PRE-AWARD PROTEST: DLA HAS ISSUED AN IMPROPER SOLE SOURCE NOTICE IN VIOLATION OF CICA AND THE FAR)

107. AEG incorporates by reference the foregoing paragraphs as if fully stated herein.

108. DLA's intended sole source award to UCIG constitutes a violation of the Competition in Contracting Act, which requires full and open competition in acquisitions for

supplies and services for Federal agencies, with the limited exceptions, which are not satisfied here.

109. CICA generally requires that solicitations permit full and open competition and contain restrictive provisions only to the extent necessary to satisfy the procuring agency's needs. 10 U.S.C. § 3206(a)(2); FAR Subpart 6.1.

110. Congress included a limited number of exceptions to CICA's full and open competition requirement; these exceptions are set forth in FAR Part 6, and each provide strict requirements that an agency must demonstrate and memorialize in writing in a Justification & Approval ("J&A") to justify other than full and open competition. *See* FAR 6.104(a) ("A justification and approval must support procedures under 6.103, except 6.103-5 and 6.103-7"); *see also* FAR 6.104-1(a) (listing the contents of the required J&A); FAR 6.302-1(d) ("Limitations. (1) Contracts awarded using this authority shall be supported by the written justifications and approvals described in 6.303 and 6.304"). Among the requirements to be documented in the J&A, DLA is required to address: "(11) A statement of the actions, if any, the agency may take ***to remove or overcome any barriers to competition*** before any subsequent acquisition for the supplies or services required. FAR 6.303-2(b)(11). Application of these exceptions mandate that an agency strictly adhere to the specific requirements in the FAR.

111. In relevant part, Congress permits agencies to use procedures other than competitive procedures when "the property or services needed by the agency are available from only one responsible source or only from a limited number of responsible sources and no other type of property or services will satisfy the needs of the agency." 10 U.S.C. § 3204(a)(1). This statutory section is implemented by FAR 6.103-1(b) ("One responsible source"), which similarly states that "[a]gencies may contract without providing for full and open competition when the

supplies or services required by the agency are available from only one responsible source and no other type of supplies or services will satisfy agency requirements." *See* FAR 6.103-1(b); *see also* FAR 6.302-1(a).

112. Here, as described above, there is no rational basis for DLA to have determined that DLA is the sole responsible contractor capable of performing the fuel supply services in Djibouti. DLA plainly knows that AEG is not only responsible but capable of supplying fuel to DLA in Djibouti but for the illegal actions documented herein.

113. DLA's intended sole source award is in violation of CICA and the FAR, which expressly states that agencies can only issue sole source contracts when there is "only one ***responsible*** source." 10 U.S.C. § 3204(a)(1); FAR 6.103-1(b); *see also* FAR 6.302-1(a).

114. Moreover, Congress has instructed that agencies cannot avoid competitive procedures when an agency's refusal to engage in competitive procedures is due to a "***lack of advance planning***," which similarly plagues DLA's decision-making. 10 U.S.C. § 3204(e)(5)(A)(i); FAR 6.301(c)(1) ("Contracting without providing for full and open ***competition shall not be justified on the basis of … [a] lack of advance planning by the requiring activity***").

115. DLA's stated sole source award fails to satisfy each of the aforementioned requirements.

116. DLA has not engaged in advance planning because it has been on notice of MOE's single source directive since 2017 and yet has chosen not to acknowledge it or implement measures to remove or overcome it. DLA appears to believe it may continue to justify its non-competitive actions using the sole source authority, but such is not available to DLA under the circumstances presented.

117. Instead, DLA has concealed from the American public the illegal boycott of American contractors and the true root cause of this sole source environment. Indeed, DLA has concealed the true "barriers to competition" in Djibouti—barriers it is required by law to identify and "remove or overcome." *See* FAR 6.104-1(a)(11); 6.303-2(b)(11). Instead, DLA has expressed publicly that it is merely requiring offerors to comply with "Mandatory Host-Nation Licensing" and "strict statutory controls"—referred to as the PAL and a fuel supply Commitment Letter from the Djiboutian government—and that since UCIG is the only offeror possessing such, it is the sole supplier who can meet the requirements.

118. DLA, rather than be transparent with the American public, and label the PAL and Supply Commitment Letter what they are—artifices of corruption—DLA, yet again, conceals what is going on in Djibouti and attempts to afford these corrupt devices credibility. *See* Ex. 2, Memorandum for Notice of Intent to Sole Source.

119. In so doing, DLA does not address the fact that the Djiboutian government will not issue a PAL or Supply Commitment Letter to an American contractor, such as AEG, and is using the PAL and Supply Commitment Letter as a means to enforce its sole source directive.

120. DLA will not admit that it has turned over its decision-making to the Djiboutian government, and that the Djiboutian government will not allow DLA to select an American contractor to supply it fuel in Djibouti. To be clear, DLA will not be honest about the true "barriers to competition" and that it has been unable to "remove or overcome" such barriers now for almost a decade. Because DLA continues to conceal these barriers and placate the Djiboutian government, the barriers to competition remain.

121. The time has come for DLA to be transparent with the American public about the sole source directive imposed in Djibouti and that it has been unable to "remove or overcome"

these "barriers" to competition since 2017. In sum, the Court should enjoin DLA and require it to conduct its procurement in accordance with governing laws and regulations.

122. In addition, DLA's efforts to legitimize the artifices of corruption—i.e., the "Mandatory Host-Nation Licensing"—in the name of ensuring a continued supply of fuel delivery in Djibouti reflects nothing short of concealing the true barriers to competition and contravenes "procurement integrity" and "fundamental fairness" required in all federal agency procurements.

123. DLA has violated both CICA's and the FAR's specific requirements in its Sole Source Notice. DLA states that it "intends to solicit and award to only one source" pursuant to 10 U.S.C. § 3204(a)(1), as implemented by FAR 6.103-1. DLA's sole justification stems from what it disingenuously describes as "stringent legal, regulatory, and logistical hurdles" "impose[d]" by "the Republic of Djibouti" via the Hydrocarbon Wholesale License; PAL; and SIHD Supply Commitment Letter "requirements." Ex. 2 at 2.

124. In reality, the Djiboutian government is not imposing "stringent legal, regulatory, and logistical hurdles"—it is instead dictating DLA to use UCIG in violation of law.

125. Notwithstanding direct knowledge of the Djiboutian government's intent to illegally designate UCIG as the sole source supplier in Djibouti, DLA has since complied and awarded ***every single subsequent contract to UCIG, and intends to do so again***. Just from 2017 to present, UCIG has, as a result, enjoyed ***over $1.3 billion in revenue***.

126. DLA has since been on notice of example after example of MOE's attempts to ensure that UCIG—and only UCIG—is able to delivery fuel in Djibouti. Indeed, on March 13, 2023, Matthew Womer explicitly acknowledged this predicament and scheme to the State Department, writing:

> It would be in the Governments best interest to ***untangle this matter*** between the two governments as soon as possible. ***The current situation leaves the US***

> ***Government with no competition and in a sole source environment where the incumbent contractor dictates what suppliers the US Government utilizes*.”**

Ex. 20, M. Womer Email, “RE: Question about CLDJ Fuels Contract” (Mar. 13, 2023), at 4.

127. Mr. Womer then expressly (and correctly) stated, as AEG does here, that “***DLA Energy is required by the Federal Acquisition Regulation (FAR) to provide full and open competition for all requirements***.” *Id.*

128. Mr. Womer was spot on in his candid correspondence and yet he is the author of the latest Sole Source Notice.

129. Two days following Mr. Womer’s correspondence dated March 13, 2023, DLA, through Jastar Singh, then provided the State Department with “background historical info regarding fuels supply in Djibouti” discussed between DLA and State. Ex. 4 at 2. That “background historical info” was none other than Djibouti’s aforementioned “***proposal in 2017 to make UCIG the sole source supplier in Djibouti***.” *Id.*

130. Put bluntly, DLA—and its key decision-makers, including Mr. Singh, have known ***for nearly a decade*** that the Djiboutian government has imposed a single source directive ensuring that only UCIG will receive billions of dollars in revenue from the United States government and United States taxpayers.

131. Notwithstanding this knowledge, DLA has instead issued a Sole Source Notice—something that it has expressly acknowledged as inappropriate and contrary to U.S. law for nearly a decade.

132. DLA’s conduct prejudices AEG by preventing it from competing to provide fuel supply services in Djibouti.

133. For these reasons, the Court should sustain this protest.

## COUNT III

**(PRE-AWARD PROTEST: DLA HAS IMPROPERLY DEEMED UCIG RESPONSIBLE IN AN ARBITRARY AND CAPRICIOUS MANNER, IN VIOLATION OF FAR SUBPART 9.1)**

134. AEG incorporates by reference the foregoing paragraphs as if fully stated herein.

135. DLA has arbitrarily, capriciously, and in violation of U.S. law identified UCIG as the "Sole Capable Source" for the Solicitation while invoking "10 U.S.C. [§] 3204(a)(1), as implemented by FAR 6.103-1 (DEVIATION 2026-O0017) (AUG 2026) (Only one responsible source and no other supplies or services will satisfy agency requirements)." *See* Ex. 2 at 2.

136. DLA does not truly believe UCIG is responsible, but DLA also is unwilling to remove or overcome the barriers to competition. In turn, DLA provides in its notice that UCIG is the sole "responsible" contractor capable of supplying fuel in Djibouti, which is a threshold requirement for invoking and applying 10 U.S.C. § 3204(a)(1) and FAR 6.103-1 and FAR 6.302-1. Indeed, DLA provides: "DLA Energy intends to award a Firm-Fixed Price with Economic Price Adjustment (FFP-EPA) single-source contract utilizing commercial procedures under FAR Part 12 (Acquisition of Commercial Products and Commercial Services) in conjunction with FAR Part 15 (Contracting by Negotiation) to United Capital Investments Group, Inc. (UCIG)." *See* Ex. 2 at 1. DLA further provides: "Sole Capable Source: Currently, United Capital Investments Group, Inc. (UCIG) is the ***only identified commercial contractor*** that possesses the active, verified Petroleum Activities License, required local regulatory permissions, established in-country distribution network, and credentialed transport infrastructure capable of meeting the stringent delivery schedules and strict military fuel specifications at both Camp Lemonnier and Chabelley Airfield without severe mission degradation or disruption to U.S. military readiness. The Government ***intends to solicit and award to only one source*** under the statutory authority of 10 U.S.C. 3204(a)(1), as implemented by FAR 6.103-1 (DEVIATION 2026-O0017)(AUG 2026)

(***Only one responsible source*** and no other supplies or services will satisfy agency requirements)." *See id.*

137. DLA's responsibility determination underlying the Notice to Sole Source to UCIG violates FAR Subpart 9.1. DLA's determination of responsibility—which is a prerequisite for using this statutory and regulatory authority—failed to meaningfully consider the panoply of adverse information reflecting negatively on UCIG's integrity and, in turn, departs from FAR Subpart 9.1, which undermined any finding that UCIG has "***a satisfactory record of integrity and business ethics***" as required by FAR 9.104-1(d).

138. DLA similarly fails to appreciate that it must make an "affirmative" determination that UCIG is responsible. "No purchase or award shall be made unless the contracting officer makes an ***affirmative determination of responsibility***. In the absence of information ***clearly indicating*** that the prospective contractor is responsible, ***the contracting officer shall make a determination of nonresponsibility***." FAR 9.103(b). "A prospective contractor must affirmatively demonstrate its responsibility, including, when necessary, the responsibility of its proposed subcontractors." FAR 9.103(c).

139. "To be determined responsible, a prospective contractor must … [h]ave a ***satisfactory record of integrity and business ethics***." FAR 9.104-1(d).

140. "Before making a determination of responsibility, the contracting officer ***shall possess*** or obtain information sufficient to be satisfied that a prospective contractor currently meets the applicable standards in 9.104." FAR 9.105-1(a). "Generally, the contracting officer shall obtain information regarding the responsibility of prospective contractors, including requesting preaward surveys when necessary (see 9.106), promptly after a bid opening or receipt of offers." FAR 9.105-1(b).

141. FAR 9.105-1(c) delineates the many "sources" the contracting officer "should use" to evaluate responsibility. *See* FAR 9.105-1(c) ("the contracting officer should use the following sources of information to support such determinations: (1) Records and experience data, including verifiable knowledge of personnel within the contracting office, ***audit offices***, contract administration offices, and other contracting offices; (2) The ***prospective contractor***-including bid or proposal information (including the certification at 52.209-5 or 52.212-3(h) (see 9.104-5)), ***questionnaire replies***, financial data, information on production equipment, and ***personnel information***; (3) Commercial sources of supplier information of a type offered to buyers in the private sector; (4) ***Preaward survey reports*** (see 9.106); (5) ***Other sources*** such as publications; suppliers, subcontractors, and customers of the prospective contractor; financial institutions; ***Government agencies***; and business and trade associations").

142. Further, FAR 9.105-1(d) provides that "Contracting offices and cognizant contract administration offices that ***become aware of circumstances casting doubt on a contractor's ability to perform contracts successfully*** shall promptly exchange relevant information." FAR 9.105-1(d).

143. This Court has found that, in evaluating agency responsibility decisions, the Court may look to FAR Subpart 9.4 principles for guidance in the types of conduct that give rise to responsibility concerns and evidence supporting such. *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334 (Fed. Cir. 2001) (finding that the Court "may look to the more extensive debarment regulations for guidance, at least on questions related to the 'integrity and business ethics' requirement ). Prior to this procurement, UCIG's conduct rose to the level to warrant immediate suspension from government contracting under FAR 9.407-1, which expressly authorizes the government to suspend a contractor "***pending the completion of***

***investigation***" based on "***adequate evidence***" of the following conduct in relevant part: (a)(1) "commission of fraud or a ***criminal offense*** in connection with (i) ***obtaining***, (ii) ***attempting to obtain***, or (iii) performing a public contract or subcontract;" (a)(2) "violation of Federal or State ***antitrust statutes*** relating to the submission of offers;" (a)(3) "making false statements;" (a)(8)(i) "fraud;" (a)(10) "any other offense indicating a ***lack of business integrity or business honesty***;" and (c) "***any other cause so serious or compelling a nature*** that it affects the present responsibility of a Government contractor or subcontractor." FAR 9.407-1.

144. DLA's knowledge of the aforementioned adverse information discussed herein and before DLA in the previous bid protests regarding UCIG undermines its responsibility determination. Indeed, DLA has, for years, been on notice of serious allegations of bid rigging, collusion, overcharging, false statements and buying into contracts at below cost pricing with the intent to later seek modifications.

145. DLA has failed to actually evaluate and address the responsibility concerns stemming therefrom ***by possessing or obtaining relevant information*** to be satisfied that the offeror is responsible, and, if not, to determine that the contractor is non-responsible. *See* FAR 9.105-1(b)(1) ("Generally, the contracting officer shall obtain information regarding the responsibility of prospective contractors, including requesting preaward surveys when necessary (*see* 9.106), promptly after a bid opening or receipt of offers"); *see also* FAR 9.105-1(c)(2). DLA has thus failed to fulfill its obligations under FAR Subpart 9.1. Had DLA considered such adverse information, a determination of nonresponsibility would be the only appropriate conclusion.

146. Additionally, publicly available information reveals that more recently DLA has terminated two of UCIG's fuel supply contracts for default/cause after concluding that UCIG intentionally submitted low bids to beat out the competition and to only seek modifications later.

Consistent with the scheme AEG disclosed to DLA years ago regarding UCIG's efforts to "buy-in" to the earlier Djibouti contract only to later obtain a price modification, this alleged scheme is unethical and undermines UCIG's responsibility. DLA, itself, has recognized UCIG's pattern of unethical behavior, and Contracting Officer Womer indeed terminated one of those contracts, Contract No. SPE605-22-D-1250, on March 7, 2022. Mr. Womer should have found UCIG non-responsible in light of these additional adverse events, which reflect negatively on UCIG's responsibility.

147. The "traditional APA standard . . . allows for review of an agency's responsibility determination if there has been a violation of a statute or regulation, or alternatively, if the agency determination lacked a rational basis." *See Impresa*, 238 F.3d at 1333; *see also J.E. McAmis, Inc. v. United States*, No. 22-570, 2023 WL 2657005, at *5 (Fed. Cl. Mar. 10, 2023) ("This Court evaluates bid protests under the Administrative Procedure Act's ('APA') standard of review for agency actions" (citing *inter alia Impresa*, 238 F.3d at 1332)).

148. FAR 3.303 and DOJ Guidance instructs agencies to look for indicators the offerors colluded by reviewing the similarities of their proposals looking for any evidence that the offerors were working together in the preparation of their independent proposals.

149. Under DOJ Guidance for identifying indicators of collusion and governing antitrust case law, the adverse information before DLA evidenced collusion *per se*. *See* Preventing And Detecting Bid Rigging, Price Fixing, And Market Allocation, U.S. Dep't of Justice (Dec. 1, 2022)[3] ("DOJ Antitrust Primer").

---

[3] Available at, https://www. https://www.justice.gov/atr/preventing-and-detecting-bid-rigging-price-fixing-and-market-allocation-post-disaster-rebuilding.

150. DOJ's Antitrust Division has identified "suspicious indicators" of collusion. *Id.* Among them, at least two, appear particularly relevant here: "[y]ou notice that the bids of all companies ***are very close (an indicator that bidders knew each others' prices)***;" and "[y]ou notice the ***same increment*** between the bids of each company." *See id.*

151. FAR 3.303(c) similarly identifies "[p]ractices or events that may evidence violations of the antitrust laws." *See* FAR 3.303(c). Among the list of "practices or events that may evidence violations of antitrust laws include" … "[a]ny incidents ***suggesting direct collusion among competitors***, such as the appearance of ***identical calculation or spelling errors*** in two or more competitive offers or ***the submission by one firm of offers for other firms***." FAR 3.303(c)(8). "Any agreement or mutual understanding among competing firms that restrains the natural operation of market forces is suspect." FAR 3.303(b). Antitrust laws make these anti-competitive collusive practices illegal. *See* DOJ Antitrust Primer ("Price fixing, bid rigging, and other forms of collusion are illegal and are subject to criminal prosecution … "); *see also, e.g.*, 15 U.S.C. § 1.

152. As the Court recognized in dicta,

> I would be remiss if I did not remark in dicta ***my concerns regarding the contracting officer's decision to summarily disregard AEG's documented allegations of bid rigging, fraud, and corruption against the very contractor being awarded the sole source contract*** in the course of the contractor's performance of the predecessor contract upon which it secured its status as the incumbent contractor.
>
> I am not saying that the contracting officer should not have taken into account the source of the allegations, that being the disappointed competitor, or that discounting the allegations was not reasonable, but ***the manner in which they were seemingly disregarded raises serious questions regarding this Court's ability to discern whether they were disregarded or discounted and leaves many questions unanswered.***

Ex. 14, Redacted *Part II* Tr. at 190:2–22.

153. Importantly, harm need not be shown. Collusion is *per se* illegal without consideration of the claimed benefits, including whether the ultimate prices were reasonable:

> Under the Sherman Act, bid rigging is per se illegal. If you find there was a conspiracy to rig foreclosure sales bids, it does not matter why the bids were rigged or ***whether the sales price was too high or low; reasonable or unreasonable; fair or unfair***. It is not a defense to bid rigging that the defendant may have had good motives, or may have thought that what he was doing was legal, or ***that the conspiracy may have had some good results***. You may not consider any justification for rigging the sales bids.

*See United States v. Guthrie*, 814 F. Supp. 942 (E.D. Wash. 1993), *aff'd* 1994 U.S. App. LEXIS 3055 (9th Cir. 1994) (jury instructions); *see also Arizona v. Maricopa County Med. Soc.*, 457 U.S. 332, 351 n.23 (1982) ("***the law does not permit an inquiry into their reasonableness***. They are all banned because of their actual or potential threat to the central ***nervous system of the economy***") (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 226, n.59 (1940)); *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980) ("***no excuse that the prices fixed are themselves reasonable***."). "Per se violations arise from 'certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are ***conclusively presumed to be unreasonable*** and therefore illegal without elaborate inquiry as to the ***precise harm they have caused or the business excuse for their use***.'" *TFWS, Inc. v. Schaefer*, 242 F.3d 198, 209 (4th Cir. 2001) (quoting *Cont. T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 50 (1977)).

154. FAR Subpart 9.1 required DLA to evaluate UCIG's responsibility and to conduct appropriate due diligence—not to just rubberstamp a responsibility decision as a perfunctory task. Upon identifying any one of these pieces of adverse information, ***let alone all***, DLA should have obtained information sufficient to be satisfied that UCIG was responsible and, in the absence of information ***clearly indicating*** that UCIG was responsible, DLA should have made a determination of nonresponsibility. FAR 9.105-1(c) ("Obtaining information") makes clear that DLA has broad authority to use a plethora of information-gathering and investigative tools at its disposal,

including, at a bare minimum, inquiring with UCIG about the adverse information, conducting a pre-award survey into the issues, conferring with one of the investigative agencies, or other appropriate due diligence. FAR 9.105-l(c).

155. Instead, DLA's determination that UCIG was responsible under FAR Subpart 9.1—***which is a nonwaivable prerequisite prior to making any award***—cannot be based on a rational basis, is arbitrary and capricious, and violates governing regulations. *See Remington Arms Co, LLC v. United States*, 126 Fed. Cl. 218, 231 (2016) (finding contracting officer's responsibility determination "arbitrary and capricious").

156. Due to the adverse information before DLA concerning UCIG's lack of business integrity and responsibility, UCIG cannot reasonably meet the responsibility requirements provided under FAR Subpart 9.1. In turn, DLA's responsibility determination underlying its Sole Source Notice lacks a rational basis, is arbitrary and capricious, and contravenes governing regulations and case law.

157. Based on any rational review of the record, DLA should have found UCIG non-responsible in light of the adverse information before DLA because such conduct reveals that UCIG does not have "a satisfactory record of integrity and business ethics" and is not "otherwise qualified and eligible to receive an award under applicable laws and regulations." FAR 9.104-1(d), (g).

158. DLA's conduct prejudices AEG by preventing it from competing to provide fuel supply services in Djibouti.

159. For all these reasons, the Court should sustain this protest.

## COUNT IV

### (INJUNCTIVE RELIEF)

160. AEG incorporates by reference the foregoing paragraphs as if fully stated herein.

161. AEG is likely to succeed on the merits, as detailed above because DLA acted arbitrarily and capriciously and in violation of governing law and regulations by complying with the MOE's illegal boycott of American companies and by complying with the PAL and Supply Commitment Letter terms identified in the Sole Source Notice.

162. Thus, since AEG was prejudiced by DLA's arbitrary and capricious action, AEG requests that this Court grant AEG preliminary and permanent injunctive relief enjoining DLA from awarding the sole source to UCIG, from continuing to make sole source awards to UCIG in the future based on these illegal terms, and to compete the procurement without the complained of terms and in compliance with governing U.S. laws and regulations.

163. AEG will meet its burden to show that preliminary and permanent injunctive relief is appropriate and necessary here. Specifically, AEG will demonstrate that it will prevail on the merits, that it will suffer irreparable harm if the Court withholds injunctive relief, that the harm to AEG in not being able to fairly compete for this award outweighs any harm to DLA, and that granting such injunctive relief serves the public interest in open and fair competition in public procurement.[4]

## **PRAYER FOR RELIEF**

WHEREFORE, AEG respectfully requests that the Court:

1. Declare that DLA's Sole Source Notice, including the terms therein, violate governing U.S. law and regulations;

2. Declare that DLA's intended sole source award to UCIG is improper and in violation of U.S. law and regulations;

---

[4] Prior to filing the instant bid protest, AEG, through counsel, conferred with the government who agreed to a voluntary stay of the sole source award, as described herein, which obviates the need for AEG to file for preliminary injunctive relief at this time.

3. Direct DLA to conduct this procurement in accordance with governing laws and regulations;

4. Permanently enjoin DLA from proceeding forward with its intended Sole Source Notice and award to UCIG;

5. Permanently enjoin DLA from issuing sole source awards to UCIG to procure fuel in Djibouti based on terms and findings that violate U.S. law and regulations;

6. Award AEG its attorneys' fees, expenses, and costs in pursuing this action in accordance with the Equal Access to Justice Act; and

7. Grant AEG any further relief that the Court deems appropriate.

Dated October 15, 2026

Respectfully submitted,

BAKER HOSTETLER LLP

By: */s/ Todd J. Canni*

Todd J. Canni
1900 Avenue of the Stars
Suite 2700
Los Angeles, CA 90067
Tel: 202.384.6223
tcanni@bakerlaw.com

*Attorney of Record for*
*Associated Energy Group. LLC*

Of Counsel:

Kevin T. Barnett
Stephen E. Ruscus
Kevin N. Dorn
Aleksey Pricinovskis
BAKER & HOSTETLER LLP
1717 K Street NW, Suite 800
Washington, DC 20006
kbarnett@bakerlaw.com
sruscus@bakerlaw.com
kdorn@bakerlaw.com
apricinovskis@bakerlaw.com

## TABLE OF EXHIBITS

| NEW | Description of Exhibit | Date |
|---|---|---|
| 1 | Djiboutian Ministry of Energy Note to Jastar Singh and U.S. Embassy Response | Apr. 13, 2017; May 23, 2017 |
| 2 | Memorandum for Notice of Intent to Sole Source | Sept; 29, 2026 |
| 3 | Declaration of Retired Col. Todd Cheney | Oct. 14, 2026 |
| 4 | J. Singh Email to J. Chamberlain forwarding 2017 Emails Regarding MOE Note | Mar. 15, 2023 |
| 5 | MOE Impeding Performance Email | Feb. 22, 2023 |
| 6 | M. Womer Email, “RE: New Developments in Djibouti—Attention Requested” | Feb. 27, 2023 |
| 7 | T. Cheney Email, re: “Update From Djibouti” | Mar. 8, 2023 |
| 8 | M. Womer Email, “RE: Licenses” | Mar. 16, 2023 |
| 9 | T. Cheney Email, re: “Djibouti” | Mar. 21, 2023 |
| 10 | T. Cheney Email, “RE: NOC Djibouti Licensing” | Mar. 27, 2023 |
| 11 | T. Cheney Email, “MOE blocking fuel deliveries” | Apr. 1, 2023 |
| 12 | M. Womer Email, “RE: Meeting Request” | May 25, 2023 |
| 13 | Letter from MOE Director of Hydrocarbons (original and translated) | Oct. 16, 2023 |
| 14 | Redacted Transcript of Proceedings, *Associated Energy Group, LLC v. United States*, No. 23-2158 (Fed. Cl. Mar. 19, 2024) (ECF No. 52) | Feb. 29, 2024 |
| 15 | Part I ECF No. 73, Def.’s Notice of Corrective Action | Nov. 30, 2023 |
| 16 | Redacted Sole Source J&A No. 23-0027 | Sept. 28, 2023 |
| 17 | Sole Source Modification | Feb. 29, 2024 |
| 18 | Combined Synopsis/Solicitation No. SPE605-24-R-0205 | Apr. 2, 2024 |
| 19 | DLA’s Post-Award Debrief to AEG | Oct. 7, 2024 |
| 20 | M. Womer Email, “RE: Question about CLDJ Fuels Contract” (Mar. 13, 2023) | Mar. 13, 2023 |
| 21 | Agreement Between the Government of the United States of America and the Government of the Republic of Djibouti on Access to and Use of Facilities in the Republic of Djibouti | Feb. 19, 2003 |